UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | No. 2:06-CR-72 |
| ) | |
| MEKAELA ARBITRON MEADOWS ) | |
| and ) | |
| WENDALL A. LANIER ) | |

**<u>REPORT AND RECOMMENDATION</u>**

The defendant Meadows has filed a "Motion to Suppress the Fruits of the Poisonous Tree." (Doc. 27). This motion was adopted by the defendant Lanier.[1] The defendant Lanier has filed a motion to suppress results of [a vehicle] stop.(Doc. 45). Mr. Lanier also has filed a motion to suppress any statements made by him to law enforcement agents. (Doc. 46). These motions have been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 12, 2007.

All of these motions are interrelated to some extent, and the facts cannot easily be neatly segregated. Accordingly, this single report and recommendation will address all three motions to suppress, and in this regard, the following facts are by the magistrate judge:

Meadows, Lanier, and McGee are jointly indicted for possessing 50 grams or more

---

[1]*See*, Motion, Doc. 57 and Order, Doc. 61.

of crack cocaine with the intent to distribute it.[2]  The bulk of the evidence against the defendants, and the most damning, was obtained from Rooms 233 and 235 of the Best Western Motel in Johnson City, Tennessee. [3]

On October 18, 2006, the defendant Meadows rented Rooms 233 and 235 at the Best Western Motel in Johnson City, Tennessee.  There is no dispute that the rooms were lawfully rented and paid for by Ms. Meadows.  In the early afternoon, a motel maid entered Room 233 to clean it.  The room was vacant at that time.  When the maid entered, she observed a hot plate with a Pyrex pot on it; the pot contained liquid and another substance floating in the liquid.  Further, she noticed various other things in plain view which caused her to believe that illegal drugs were being manufactured.  She contacted her immediate supervisor who also went into the room, and both women ultimately reported their observations and concerns to the motel manager, Steven Bales.  All of them returned to Room 233,  and saw the hot plate, the cooking pot, spoons, rubber bands, baking soda, condoms, and syringes.  Bales told his two employees to leave the room. He then called 911 to request that the police come and inspect the contents of the room and, if necessary, remove them. Bales unequivocally testified that he was concerned that he had stumbled into a "meth

---

[2]Mr. McGee has indicated his intent to enter a plea of guilty.

[3]There is some additional evidence that will be offered against these defendants, including evidence seized from the person of Mr. Lanier when he was arrested, as well as statements made by Mr. Lanier.  This evidence, however, was obtained as a direct result of the evidence earlier discovered in Rooms 233 and 235.   But if the evidence seized from those two motel rooms is suppressed, Mr. Lanier's statements to law enforcement agents, as well as the evidence seized from his person, also should be suppressed since it was the direct result of the searches of the two motel rooms.

lab," and that he was concerned for the safety of his employees and that of his other guests.

Johnson City Police Officer Thomas Duncan responded to the call, and talked to Mr. Bales; Bales told Officer Duncan that he had found some kind of illegal substance in Room 233, that he wanted it removed, and that he was concerned for the safety of his staff and other guests.

Duncan, recognizing that there was at least a potential problem regarding his entry into a guest motel room, contacted his supervisor who told him, "if the manger wants it removed and safety is a concern, go into the room and get it out." Thereafter, Mr. Bales used a pass key to open Room 233 and he and Officer Duncan entered. As did Bales and the motel staff before, Duncan observed the hot plate, cooking pot, and all the other paraphernalia. He immediately recognized that the substance in the pot likely was crack cocaine, as opposed to methamphetamine. It is stressed that what Duncan observed was in plain view.

Duncan administered a field test for the liquid in the pot; the test indicated it was cocaine.

In the meantime, Agent Matthew Thompson of the Drug Task Force arrived, and he too entered the room and made the same observations.

Within a matter of a few minutes, Manager Bales told Agent Thompson that Ms. Meadows rented both Room 233 and Room 235. Upon learning that no law enforcement officer had knocked on the door of Room 235, Thompson did so. Ms. Meadows opened the door and, as she did so, a cloud of marijuana smoke roiled out; Thompson immediately

3

recognized the smoke for what it was. Thompson asked Meadows if he could confirm that she was the only one in the room and Meadows consented. Thompson testified that as he walked through the room to look into the bathroom (to confirm no one else was in the room), the marijuana smoke was so thick that he became dizzy and nauseated. Other than confirming that no one else was in Room 235, Agent Thompson did not look around or make any visual inspection of the room's contents.

Thompson Mirandized Ms. Meadows and asked her if there was any marijuana in the room. She told him there was, both in her purse and in the dresser. He then asked her permission to search both Room 235 and Room 233. She first consented to a search of 235, but not 233. Subsequently, she consented to a search of both rooms, but vacillating all the while. Later still, she again said she would consent to a search of Room 235 but not of Room 233. In light of her continued vacillation, Agent Thompson appropriately decided to obtain search warrants for the two rooms rather than rely upon any consent by Ms. Meadows.

Agent Thompson prepared affidavits for the issuance of separate search warrants for the two rooms on the premises. The two affidavits are essentially identical, at least in the relevant aspects:

> On 10-18-06, Washington County 911 received a phone call from the Best Western Hotel located at 2406 North Roan Street, Johnson City, Tennessee. The management of Best Western advised Washington County 911 that the maid service of the hotel had been cleaning Room #233 and during the course of cleaning the room, they located what they believed to be crack cocaine (cocaine base) in the room. Washington County 911 dispatched Ptl. Thomas Duncan of the Johnson City Police to respond to

the Best Western. Upon arrival, Plt Duncan made contact with Steve Bales, manager of the Best Western, Mr. Bales stated that he wanted the substance removed from the room. Mr. Bales took Ptl. Duncan to Room #233 and opened the door. Mr. Bales and Ptl. Duncan went into the room. Ptl. Duncan observed a wall mounted safe in the room. On top of the safe, Ptl. Duncan observed a set of digital scales and two boxes of plastic baggies. Ptl. Duncan observed that the safe door was open and observed a glass Pyrex pot in the safe, the Pyrex pot contained a liquid substance and it looked like there was crack cocaine floating in the liquid. Ptl. Duncan called [Agent Thompson]. [Agent Thompson] instructed Ptl. Duncan to field-test the substance. Ptl. Duncan field-tested the liquid and it resulted positive for the presence of cocaine. Affiant [Agent Thompson] responded to the Best Western. Upon arrival, affiant made contact with Ptl. Duncan. Affiant observed a liquid and also observed a field-test kit used to test the substance. Affiant spoke to Steve Bales and obtained information on the renter of the room. Mr. Bales stated that Mekaela Arbitron Meadows had rented the room and also rented Room 235. Affiant and DEA Task Force Agent Workman went to Room 235 and knocked on the door. Mekaela Arbitron Meadows answered the door. Agents identified themselves and asked Meadows to step outside. Affiant asked if there was anyone inside the room. Meadows stated that there was not any one in the room. Affiant asked Meadows for permission to check and see if anyone else was in the room. Meadows consented. Affiant walked into the room and looked for additional suspects. As affiant walked through the room, affiant noticed an extremely strong odor of marijuana. Affiant started to become dizzy and started to feel sick. Affiant cleared the room and walked back outside. Affiant advised Meadows of her Miranda rights and asked Meadows if there was marijuana in the room. Meadows stated that she had a plastic baggie of marijuana in her purse located in the room and also had a small amount of marijuana in the dresser. Affiant drafted written consents to search for both Room 233 and

> 235. Affiant provided these documents to Meadows and she read them. Meadows then refused to sign the documents.
>
> Furthermore, both rooms were locked and secured. Both rooms were now under constant surveillance by agents of the 1st Judicial District Drug Task Force. Affiant has worked as a narcotics agent for the 1st Judicial Drug Task Force for approximately seven years. Affiant has attended numerous narcotics related schools. Affiant has received training in the identification of narcotics and methods used to manufacture cocaine base.[4]

A General Sessions Court Judge for Washington County, Tennessee issued the warrants based upon the two affidavits. It is appropriate to interject at this juncture that the maid and her supervisor had reported to the law enforcement officers that just before the maid undertook to clean Room 233, the other two occupants of Room 233 and 235 had left in two separate vehicles, one a silver car, and the other a maroon-colored car. They were described as black males, one having short hair, and the other having long dredlocks. Fearing that an on-going search of the room would frighten away these two suspects if they did return to the motel, Agent Thompson postponed his search and instructed other agents and officers to secure vantage points to watch the parking lot. After approximately an hour had passed, a blue Chevrolet Impala entered the parking lot and pulled into one of the spaces more or less directly in front of Rooms 233 and 235, both of which were located on the upper or second level of the motel. Agent Thompson observed the occupants of the Impala look upward at the balcony and at Room 233. Almost at the same time, a silver-colored Hyundai

---

[4]Exhibits 1 and 4.

vehicle began to enter the parking slot directly adjacent to the one occupied by the Impala. However, probably because the driver noticed police officers on the second floor or balcony area, the Hyundai suddenly stopped, backed up at a high rate of speed with squealing tires, and fled. At the same time, the Impala also reversed course and attempted to leave, but it was stopped by the officers.[5] Officers interviewed the occupants of the Impala and learned that they were staying in Room 239. Although the officers had information from the motel staff that the occupants of Room 239 had at the very least conversed with the occupants of Room 235 and 233, the officers found no evidence that justified detaining those individuals any further, and they were allowed to leave.

As Agent Thompson was putting out a "BOLO"[6] for the Hyundai, a maroon car entered the lot, and Agent Thompson and other agents observed that the driver and his passenger were both black males; the passenger had extremely long dredlocks as described by the motel staff. As officers approached the maroon vehicle, it too began backing up in an effort to leave. Police Officer Street told the driver of the maroon vehicle to stop; when the driver refused to do so, Street pulled his weapon and repeated his instructions in a more emphatic fashion. The maroon car stopped.

Both occupants, now known to be Lanier and McGee, were told to exit the car, and were advised of their constitutional rights. Both were placed in handcuffs. Lanier was patted

---

[5]The silver Hyundai was later discovered abandoned behind another motel in the Johnson City area.

[6]A "Be on the Lookout" radio alert.

down and a small bulge was detected in his pants pocket. The officer suspected that it was drugs, and he removed it from Lanier's pocket. It indeed was a packet of marijuana. The officer then asked Lanier if he had any other contraband on him, and Lanier responded, "I have some *"work"* on me." Work is street jargon for crack cocaine. Upon instructions of Officer Street, Lanier reached into his underwear and retrieved a quantity of crack cocaine, which he gave to the officer.

At this point, Agent Thompson executed the two search warrants in Rooms 233 and 235, seizing the contraband described earlier in this report.[7]

Meadows and Lanier claim that Police Officer Duncan had no lawful authority to enter Room 233, and everything that occurred thereafter was the direct result of the observations he made upon his entry into that room. They insist that not only should all evidence seized from that room be suppressed, but also all evidence seized from Lanier's person and the statements he made after his arrest, since the stop of his vehicle was the direct and inevitable result of what Officer Duncan observed in Room 233.

The United States argues that (1) exigent circumstances justified Officer Duncan's warrantless entry into Room 233 and (2) even if there were no exigent circumstances justifying his entry, the evidence would have been inevitably discovered based upon the report of the motel maid, her supervisor, and motel manager Bales.

---

[7]In addition to the evidence in Room 233 that was in plain view as described earlier in this Report, also seized from 233 were plastic baggies, marijuana, digital scales, and 63.4 grams of crack cocaine. From Room 235, the agents seized an Ecstasy pill, marijuana, new clothing with price tags attached, 33 grams of power cocaine, and 132 grams of crack.

**INEVITABLE DISCOVERY**

The doctrine of inevitable discovery is nothing more than a commonsensical recognition that unlawfully seized evidence nevertheless should be admitted into evidence if that evidence would have been invariably discovered by proper means. *See, e.g., Nix v. Williams*, 467 U.S. 431 (1984); *United States v. Hatfield*, 815 F.2d 1068 (6th Cir. 1987); *United States v. Kennedy*, 61 F.2d 494 (6th Cir. 1995). However, the doctrine does not apply to evidence that is obtained on the basis of knowledge learned as a result of a prior illegal search. *See, United States v. Leake*, 95 F.3d 409, 417 (6th Cir. 1996).

If it be assumed for the purpose of analysis that Officer Duncan's entrance into Room 233 cannot be justified, then it follows that his observations of the heating plate, Pyrex pot, syringes, etc., which Agent Thompson subsequently incorporated into his affidavits filed in support of his applications for the two search warrants, is tainted evidence. To determine if the inevitable discovery doctrine applies, the court is required to excise from Agent Thompson's affidavits the tainted information and thereafter determine if the remaining information in his affidavits establishes probable cause for the issuance of the warrants. *United States v. Black*, 8 F.Appx. 408, 411 (6th Cir. 2001).[8] If all the "tainted" information is excised from Thompson's affidavits, this is all that remains:

> On 10-18-06, Washington County 911 received a phone call from the Best Western Hotel located at 2406 North Roan Street Johnson City, Tennessee. The management of the Best Western advised Washington County 911 that

---

[8] 2001 WL 427769.

> the maid service of the hotel had been cleaning Room #233 and during the course of cleaning the room, they located what they believed to be crack cocaine (cocaine base) in the room.

Does the foregoing establish probable cause? It does not. All that the Sessions Court Judge would know is that three employees of a hotel, all lay persons, had seen *something* that they believed to be crack cocaine. The affidavit does not indicate that any of these employees had any experience with identifying crack cocaine, and it supplies no other information to describe what they actually saw. In this redacted form, the affidavit simply states the bare, uncorroborated conclusions of three citizens based upon something they saw in Room 233.

To be sure, Agent Thompson had more information at his disposal which he could have included in his affidavit, had he chosen to do so. He could have described the hot plate, the clear liquid with a substance floating in it, the syringes, and the condoms, all of which together arguably would have supported a finding of probable cause; at least a detailed description regarding what the three citizens actually observed would have come much closer to establishing probable cause. But the fact that Agent Thompson had this information which he *could* have inserted into his affidavits is irrelevant:

> [T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause.

*United States v. Johnson*, 22 F.3d 634, 683 (6th Cir. 1994).

In summation to this point, the affidavits as excised do not state probable cause to search either of the motel rooms. Moreover, the fact that Agent Thompson had additional information which he could have inserted into the affidavits which arguably would have created probable cause does not trigger the application of the inevitable discovery doctrine.

**EXIGENT CIRCUMSTANCES**

First of all, these defendants had a reasonable expectation of privacy in the motel rooms. *See, United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997). Thus, the protection of the Fourth Amendment against unreasonable searches and seizures applies to a person's motel room no less than his residence. However, a hotel guest "undoubtedly gives 'implied or express permission' to 'such persons as maids, janitors, and repairmen' to enter his room 'in the performance of their duties.'" *Stoner v. California*, 376 U.S. 483, 489 (1964) [citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)]. But, regardless of any implied consent to janitors and maids to enter motel rooms, a "private search" by non-governmental persons does not implicate the Fourth Amendment. *See, United States v. Jacobsen*, 466 U.S. 109, 114, (1984). Therefore, these defendants may not complain of hotel manager Bales and his employees entering Room 233 and subsequently calling the police. However, it should also be noted that hotel staff may not consent on behalf of a guest to a police officer's warrantless entry into that guest's room. *See, Stoner*, 376 U.S. at 489.

Accordingly, the defendants have no complaint under the Fourth Amendment regarding Manager Bales' and his two employees' entries into Room 233. But, as explicitly held in *Stoner, supra,* motel manager Bales could not consent to Officer Duncan's

warrantless entry into Room 233. If Officer Duncan's entry can be justified under the Fourth Amendment, it must be on the basis of exigent circumstances.

An exigent circumstance or situation is simply one that requires immediate action. In the context of Fourth Amendment jurisprudence, an exigent circumstance is one that excuses the necessity for the procurement of a search warrant. To justify a warrantless entry and search on the basis of exigent circumstances, the Government must show that the following existed at the time of the entry and search: (1) a need for immediate action that would have been defeated if the officers had taken time to procure a warrant, (2) a sufficiently important governmental interest being served by the warrantless entry, and (3) that weighing the governmental interest against the defendant's interest in the privacy of his home (or motel room), the defendant's conduct somehow diminished that right. *United States v. Rohrig*, 98 F.3d 1506, 1518 (6th Cir. 1996).

There are four general categories of exigent circumstances: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) prevention of a suspect's escape, and (4) a risk of danger to the police or others. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).

If the circumstances preceding Officer Duncan's entry into Room 233 were exigent, it will be because circumstances then known to him indicated a risk of danger to the public, *viz*, the motel staff and other guests.

Both the maid and then her supervisor were concerned that they had observed a drug manufacturing operation in Room 233. Mr. Bales testified that he was fearful that the

occupants of Room 233 were manufacturing methamphetamine. His concern was anything but baseless, and the extreme dangers attendant to methamphetamine production are well-known. Not only is there the danger of an explosion due to the volatile chemicals used in the process, poisonous and long-lasting residue is generated. Mr. Bales understandably wanted to confirm what was in Room 233, and he wanted it out. His call to the police was the appropriate response. Then what should have Officer Duncan have done? He obviously had concerns about entering the motel room, because he called his supervisor. His supervisor, in the opinion of this magistrate judge, gave him appropriate instructions: "if safety is a concern, go into the room and get it out." To put this into perspective, consider the possible scenarios if Officer Duncan had elected to attempt to get a search warrant. First, it is highly questionable that he could have gotten a search warrant based upon the information he then had. Secondly, regardless of whether he was able to get a search warrant or not, some amount of time would have passed. In either event, if there was a methamphetamine lab in Room 233, it was continually polluting the room and possibly the rest of the motel, and it posed a constant risk of exploding violently. Officer Duncan had enough information from Mr. Bales that he knew that the occupant of Room 233 was cooking not chicken soup, but something illegal, and that "something" could have been methamphetamine with all its attendant dangers. His entry into Room 233 to find out precisely what he and the motel confronted not only was reasonable, it was virtually required of him as a public safety officer.

Looking at the *Rohrig* factors,[9] there was an immediate need for action that would have been defeated if Officer Duncan had taken the time to secure a warrant; as discussed, the risk of poisonous fumes or an explosion was present. Bearing in mind that the primary role of the Government and its police is to protect the public, a determination of what was in Room 233 was a "sufficiently important governmental interest" to justify a warrantless entry. Lastly, that governmental interest outweighed the defendants' right of privacy in that motel room simply because it was their activity - manufacturing drugs - that created the danger which Officer Duncan was duty-bound to eliminate, if possible.

During the suppression hearing, much was made of the fact that Officer Duncan knew beforehand that the drug manufacturing in the motel room was for crack cocaine and not methamphetamine. That is a distinction without a difference. Firstly, the motel manager explicitly testified that he was concerned that the occupants were cooking methamphetamine in Room 233; a precise identification of what was being manufactured in Room 233 could not be made until there was an actual entry and observation. Moreover, the manufacture of crack cocaine also involves the use of volatile chemicals which poses a risk of explosion and fire, as explained by Agent Thompson during the hearing.

In conclusion, the situation known to Officer Duncan constituted exigent circumstances that justified his warrantless entry into Room 233. Once in that room, he was able to observe in plain view various items that he recognized as crack cocaine and the

---

[9] 98 F.3d at 1518.

equipment used to manufacture it. Those observations were therefore properly includable in Agent Thompson's affidavits to secure a search warrant for both Room 233 and Room 235.

**THE VEHICLE STOP AND MR. LANIER'S STATEMENTS**

If the warrantless entry into Room 233 was unlawful under the Fourth Amendment, then all that resulted therefrom indeed would be "fruit of the poisonous tree." There would have been no probable cause to attempt to stop either the silver Hyundai or the maroon vehicle. Indeed, there would not have been even a reasonably articulable suspicion to justify a *Terry* stop of either vehicle. However, Officer Duncan's entry Room 233 was lawful under the Fourth Amendment. What he and Agent Thompson observed in that room, coupled with the information from the motel staff regarding the description of the other occupants of that room and their vehicles, at the very least provided a basis to make an investigatory stop of those vehicles and detain the occupants for questioning. See, *United States v. Hensley*, 469 U.S. 221, 226 (1985); *United States v. Roberts*, 986 F.2d 1026, 1030, (6th Cir.) cert. denied, 510 U.S. 900 (1993). The sudden flight of the silver Hyundai, and the maroon vehicle's attempt to flee, coupled with what the officers knew about Room 233, gave rise to probable cause to arrest the occupants of the maroon vehicle.

The officers pat down search of Mr. Lanier was one incident to Lanier's arrest, and was proper under the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218 (1973). As a result, the bag of marijuana seized from Lanier's person was proper.

Lastly, Lanier was appropriately advised of his constitutional rights as required by

*Miranda v. Arizona*, 384 U.S. 436 (1966). It was only after he was advised of his Miranda rights that he made his incriminating statements and voluntarily handed over the bag of crack cocaine that he had secreted in his underwear.

**CONCLUSION**

It is respectfully recommended for the foregoing reasons that defendants' motions to suppress (Docs. 27, 45, and 46) be denied.

Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

Respectfully submitted,

    s/ Dennis H. Inman
United States Magistrate Judge